SHAPIRO BROTHERS FACTORS CORPORATION, A BODY CORPORATE, PLAINTIFF-RESPONDENT, v. CHEROKEE SILK CORPORATION, LIKEWISE A BODY CORPORATE, AND HARRY KAPLAN, DEFENDANTS-APPELLANTS, AND HARRY KLOTZ AND VICTOR J. HOPKINS, DEFENDANTS.

Submitted October 26, 1934—Decided January 10, 1935.

For the appellants, *Peter Cohn.*

For the respondent, *David Kimmel.*

The opinion of the court was delivered by

HEHER, J. By a contract entered into on June 1st, 1932, plaintiff (hereinafter referred to as "Shapiro") undertook to factor the goods of the defendant-corporation (hereinafter referred to as "Cherokee"), a dealer in silks. Shapiro thereby agreed to "guarantee payment of all orders received" by Cherokee, and "approved" by the former's credit bureau, pro-

vided Cherokee made "good and proper deliveries pursuant to such orders." This guaranty was expressly "limited to a guarantee of the solvency of the customers, and the payment by the customers at maturity when they accepted the merchandise as good and valid delivery under the various orders and contracts so approved and checked by" the factor "as to credit." It was further provided that if the vendee *claims* there have been defaults or delays in deliveries or imperfect, defective or insufficient deliveries and refuse to pay for any other reason except because of insolvency and consequent inability to pay," Shapiro would, in such event, "have the right to charge back * * * such uncollected accounts, and be relieved of * * * responsibility." There was an express assignment to Shapiro, effective "immediately upon the shipment of the goods," of "all outstanding accounts arising from shipments" approved by it. Shapiro bound itself to advance to Cherokee, monthly, eighty-five per cent. of the price of the merchandise shipped, less "returns, * * * discounts and allowances," and to pay the balance of Cherokee's "equities" when the "accounts shall have been paid by" its "customers or at their maturities whichever is sooner." There was a further stipulation that all sales shall be "credited" monthly, and that in case the vendee shall, after the sale shall have been so credited, "reject the same or refuse to pay the full purchase price thereof when due, on account of any merchandise difference * * *, or for any reason claims a defense or offset thereto, the amount credited * * * with interest * * * may be charged back to" Cherokee. The term prescribed was from the date of the contract to May 31st, 1933, and "thereafter from year to year unless ninety (90) days' notice in writing in any year is given by either party of its intention to terminate the contract on May 31st next succeeding."

Kaplan, Klotz and Hopkins, by a separate undertaking, guaranteed that "the said agreement and all the terms and provisions thereof * * * shall be duly, fully and faithfully carried out and performed" by Cherokee, "without recourse first being had against" the latter.

Merchandise was sold and delivered by Cherokee to two concerns, Ambassador Silk Company (hereinafter referred to as "Ambassador") and Union Silk Mills, Inc. (hereinafter referred to as "Union"). These purchasers, claiming prejudicial delays in the delivery of merchandise, in violation of their respective contracts with Cherokee, withheld payment of the price of delivered goods, and Shapiro "charged back" to Cherokee the unpaid sums advanced thereon, $10,624.31, but the latter did not make refund.

The gravamen of the complaint is this asserted indebtedness. Cherokee counter-claimed, averring that Shapiro, on September 13th, 1932, "terminated said contract without notice, cause or reason therefor, declined and refused to carry out the terms of its contract, and declined and refused * * * to make advances up to eighty-five per cent. of the net shipments during any one month, as provided for * * * in the said agreement," and that, in consequence thereof, it was required to dispose of its merchandise in the open market, with substantial loss.

Judge Mackay, in the charge, directed the jury to find for plaintiff in the sum claimed in the complaint, "subject only to the counter-claim." The issue of performance *vel non* was submitted under instructions that are not criticized. The jury returned a verdict for plaintiff against all defendants (except Hopkins, who was not served with process), in the full sum claimed in the complaint, and "no cause for action" on the counter-claim, and from the judgment thereon Cherokee and Kaplan appeal.

The first insistence of appellants is that there was error in the denial of the motion to nonsuit. The asserted right to a nonsuit seems to be grounded upon the theory that Cherokee substantially performed its contracts with Ambassador and Union; that any delays in deliveries were waived by the latter, and that, consequently, they were not justified in withholding payment for the goods delivered. It is said that, in that situation, it was incumbent upon Shapiro, as the assignee of the accounts, to take appropriate proceedings against the vendees to enforce payment of the price of the goods so

delivered, before exercising the right of "charge back" reserved by the contract. But no such duty was imposed upon Shapiro by the contract. It was privileged to exercise this reserved right in the event that the vendee's refusal to pay was based upon *claimed* breaches of its contract with Cherokee, and was not the result of "insolvency and consequent inability to pay." It is stipulated that neither Ambassador nor Union was insolvent. And the refusal to pay for goods delivered was indubitably based upon asserted breaches of their respective contracts by Cherokee. The sums then claimed to be due from Ambassador, for goods delivered, was $8,545.17, and from Union $7,916.91. These sums had been advanced by Shapiro to Cherokee. The claims thus made by Ambassador and Union were subsequently arbitrated, in accordance with the provisions of their respective contracts with Cherokee, and the result was a finding by the arbitrators that Ambassador had sustained damages in the sum of $9,090, and that Union had suffered losses in the sum of $1,762.50. An award was made to Ambassador of $544.83, the difference between the damages sustained and the price of the delivered goods. The money equivalent of the damages suffered by Union was credited upon the sum due for goods delivered to it, and Cherokee was awarded the difference, $6,154.41. This latter sum was paid, and plaintiff's claim is for the balance. Therefore, as the arbitrators determined, Ambassador was not indebted to Cherokee in any sum on the assigned accounts. It follows that, in the circumstances here presented, the "charge back" was a valid exercise of a right reserved to Shapiro by the contract, and that Cherokee, and by derivation its guarantors, thereby became indebted to plaintiff. The motion for a nonsuit on this ground was therefore properly denied.

Secondly, it is urged that, in instructing the jury as a matter of law that Cherokee was indebted to Shapiro in the mentioned sum, the trial judge committed prejudicial error. It is insisted that the evidence presented the following issues of fact, viz.: (1) by whom was the factor's agreement breached; (2) was it canceled by mutual consent; (3) did

Cherokee make "good and proper deliveries" to Ambassador and Union; and (4) did the delays in deliveries to Ambassador and Union result from causes beyond Cherokee's control, and were such "delayed deliveries waived and excused." In fine, appellants insist that the jury would have been justified, under the evidence, in finding (a) that Shapiro breached the factor's agreement, and that it was not, as claimed by it, canceled by mutual consent; and (b) Cherokee did not breach its agreements with Ambassador and Union. For the reasons stated, Cherokee's performance *vel non* of its agreements with Ambassador and Union was not material on the issue thus raised. And appellants' claim that Shapiro breached the factor's agreement was submitted to the jury, and resolved against it. Moreover, it is evident that if there were such a breach, with consequent damage, Shapiro would be entitled to credit for the sums so advanced.

Thirdly, it is claimed that there was error in the denial of the motion to direct a verdict in favor of appellant Kaplan. His obligation under the contract of guaranty is conceded, but it is urged that it had then been discharged by Shapiro's release of "all claims or obligations" against Ambassador "in connection with any and all accounts receivable now in existence, arising from the sale and delivery of merchandise by Cherokee to Ambassador." It is also insisted that, for the same reason, a verdict should have been directed in favor of Cherokee. The principle invoked is that the release of the principal debtor discharges the guarantor. But it is not applicable here. Shapiro, asserting what it conceived to be its right as the assignee of the account, sought recovery from Ambassador by an action instituted in the Supreme Court of the State of New York on December 1st, 1932. The "charge back" in the case of Ambassador was made on December 22d, 1932, and in the case of Union on January 4th, 1933. Appellants point out that no action was taken by Shapiro until after the arbitration awards were made, but the undisputed evidence seems to be that the "charge backs," and action by Shapiro against the vendees, were deferred at the request of Cherokee, pending the outcome of the arbitration

proceedings. On January 16th, 1933, the action brought against Ambassador was discontinued in accordance with the provisions of a stipulation binding Ambassador to deposit with Shapiro the sum of $5,000, to indemnify the latter against loss suffered by reason of advances made by it to Cherokee on the Ambassador account. It was essentially an indemnity agreement, arrived at in compromise of the pending litigation—one that would not provide a "double recovery." It provided that out of the sum realized by Shapiro in the instant action, counsel fees, not to exceed $500, should be first paid, and in case the sum realized should exceed "such counsel fees by $2,000 or less," the amount of such excess so collected should be "returned" to Ambassador; and in case it exceeds "such counsel fees by more than $2,000," the sum of $2,000, plus six-thirteenths of the excess above $2,000 and counsel fees should be "returned" to Ambassador. The stipulation contained a mutual release clause.

In respect of the advances made by Shapiro, Cherokee, and not Ambassador, was the principal debtor. This was the obligation made the subject of the contract of guaranty. Ambassador was the principal debtor only as to the assigned accounts, if, in fact, they were supported by an actual indebtedness. This, rather, was a mere pledge of the accounts thus assigned as collateral security. Compare *Polhemus* v. *Prudential Realty Corp.*, 74 *N. J. L.* 570. When Shapiro "charged back" the advancements, it retained, under paragraph 7 of the contract, "the account receivable as security hereunder * * *." Of course, the pledgee may be liable as for conversion of the pledged collateral, if, without the consent of the pledgor, he compromises with the person liable thereon, and discharges the obligation by a release. One who receives from his debtor, as collateral security, the obligation of a third person has, ordinarily, only the power to hold such obligation, and to receive payment or collect it at maturity. An exception to the general rule, supported by reason and authority, is that the pledgee may effect a compromise of the liability evidenced by the security on terms advantageous to the pledgor, as well as to himself, especially where the maker

or obligor is insolvent, and the debt is insufficiently secured. In such case, he must account to the pledgor only for the amount actually received under the compromise. 49 *C. J.* 952.

Here the award in the arbitration proceedings, to which Cherokee was a party, finally determined that Ambassador was not its debtor. And the undisputed evidence was that, in virtue of sections 266 and 267 of the Civil Practice act of the State of New York, Shapiro would be subject to Ambassador's counter-claim arising out of the claimed breaches of contract by Cherokee, made the subject of arbitration, and that such matters could be set up in extinguishment of Shapiro's assigned account. There is no basis in the proofs for a contrary finding. The uncontradicted evidence is that the applicable rule was laid down by the Court of Appeals of the State of New York in *Seibert* v. *Dunn,* 216 *N. Y.* 237; 110 *N. E. Rep.* 447. There was, in the situation thus presented, no impairment or diminution of the security so retained. Appellants could not, under the circumstances, insist upon more than the value of the lost security. The guarantors' rights were not thereby in anywise prejudiced. Ambassador was then under no obligation to Cherokee. The point is not made that the "compromise" agreement with Ambassador was other than an indemnity in its essence, and that it would yield to Shapiro moneys which should have been credited upon the debt in suit.

Next, it is urged that the trial judge erroneously instructed the jury that it could not take "into consideration so far as the plaintiff's claim is concerned," the sum of $9,090, awarded to Ambassador and Union in the arbitration proceedings. This ground of appeal is not supported by a timely exception, and therefore need not be considered. At the conclusion of the charge there occurred this colloquy between the trial judge and appellants' counsel: "Mr. Cohn (at side bar): I would like, if your honor please, to have my young lady transcribe that charge so I can take a couple of exceptions. The court—Certainly. Mr. Cohn—So I will have it typewritten and give them to Mr. Kelley. The court—I will give

you every opportunity." The jury later returned for further instructions, but no exceptions were noted. Later in the day, after the adjournment of court, appellants' counsel "dictated" to the stenographer the exceptions now made a part of the record. It does not appear that the jury had then returned its verdict, but it is conceded that the exceptions were not noted in the presence of either the trial judge or counsel for the adversary party. In the course thus pursued, the primary significance of an exception was entirely lost sight of. It is the settled rule that, to entitle the complaining party to a review, the asserted error must be called to the attention of the trial judge at a time and in such manner that he may know that his ruling is to be made a ground of appeal, and thereby afford an opportunity to him to revise his ruling and to opposing counsel to modify his position so as to save error. *Kargman* v. *Carlo,* 85 *N. J. L.* 632; *Lyon* v. *Fabricant,* 113 *Id.* 62; *Benz* v. *Central Railroad of New Jersey,* 82 *Id.* 197.

Lastly, appellants maintain that there was error in the refusal to charge certain requests that embody, in the main, the questions here disposed of. In any event, counsel has not attempted to demonstrate error in the rulings thus made, and they therefore require no further consideration.

Judgment affirmed.

*For affirmance*—THE CHANCELLOR, CHIEF JUSTICE, PARKER, LLOYD, BODINE, DONGES, HEHER, PERSKIE, VAN BUSKIRK, KAYS, HETFIELD, DEAR, WELLS, JJ. 13.

*For reversal*—CASE, J. 1.